H. C. DeShazo v. Wool Growers Central Storage Company, et al.

No. 2907. Decided May 20, 1942.
(162 S. W., 2d Series, 401.)

*J. D. Burns and T. R. Johnson,* both of San Angelo, for plaintiff in error.

The property having been converted and sold by the defendants, the mere cashing of the check by plaintiff, after having tendered it back and demanding his property, was not a bar to his action for conversion and damages. 2 C. J. S. 1099; 3 C. J. S. 334, and cases cited in the opinion.

*Collins, Jackson, Snodgrass & Blanks,* of San Angelo, for defendants in error.

Mr. Justice Critz delivered the opinion of the Court.

This suit was filed in the District Court of Tom Green County, Texas, by H. C. DeShazo against Wool Growers Central Storage Company and the Central National Bank of San Angelo, Texas, both private corporations, to recover damages, actual and exemplary, totaling $1,610.41, for the alleged conversion by the defendants of 2347 pounds of wool, alleged to have been stored by DeShazo with the Storage Company. It is alleged that the Storage Company was in possession of the wool as a warehouseman. The case was tried in the district court with the aid of a jury, but at the close of the evidence the court, on motion of the defendants, withdrew the case from the jury and entered judgment for the defendants. This judgment was affirmed by the Austin Court of Civil Appeals. 153 S. W. (2d) 206. DeShazo brings error.

We treat the pleadings of all parties as sufficient to raise all questions of law here presented. Since the trial court withdrew the case from the jury and entered judgment for the defendants, we must view the evidence in the most favorable light for DeShazo. Also, all disputed issues of fact must be resolved in DeShazo's favor. So viewed and regarded, the evidence in this case shows:

That the Storage Company during all the time here involved was a public warehouseman, doing business in San Angelo, Texas, and holding itself out to the public as such; that DeShazo produced the 2347 pounds of wool here involved, and stored it with the Storage Company, as a warehouseman, for the purpose of obtaining a Commodity Credit Corporation Loan on it, under the provisions of the Federal Agricultural Adjustment Act, to mature as later shown. The loan was handled through and made by the Bank, in conformity with the above Act.

The Storage Company was, during all the time here involved, a warehouseman, duly holding itself out as such. The defendant bank is a banking corporation, doing business in San Angelo, Texas, and was such during all the time here involved. DeShazo during the time here involved was a stockfarmer, living near San Angelo, Texas. During the year 1939 DeShazo kept sheep, from which he produced wool. On May 16, 1939, DeShazo stored with the Storage Company 653 pounds of wool. Again, on May 18, 1939, he stored with the same company 1694 pounds of wool. On each occasion the Storage Company issued DeShazo a warehouse receipt, which expressly stated that the number of pounds of wool shown therein had been stored by DeShazo in the warehouse of the Storage Company, in San Angelo, and that such warehouse was duly licensed as such under the United States Warehouse Act and the regulations for wool warehouse thereunder. DeShazo obtained a loan for $325.00. Such loan was made by the above-named bank. DeShazo executed his note to the bank, in the principal sum of $325.00, due ten months after date, or on May 31, 1940, whichever was earlier. This note was secured by a pledge to the bank of the two warehouse receipts above mentioned. The Storage Company handled the transaction with the bank, delivered the note to it, and received payment therefor. The Storage Company then mailed its check to DeShazo for the proceeds of the note.

On September 1, 1939, long before DeShazo's note to the bank was due, the Storage Company, without any authority

from DeShazo, and without his knowledge or consent, and in violation of his rights, took DeShazo's wool and sold it to a purchaser in Boston, Massachusetts. In this connection, it is shown that neither the Storage Company nor the bank consulted DeShazo in regard to making such sale. It is further shown that neither the bank nor the Storage Company had any authority to sell the wool at the time it was sold.

After the above sale was made the Storage Company received the proceeds thereof, and after paying the note at the bank it sent to DeShazo its check in the sum of $116.88, for the balance remaining, after paying itself a commission of $11.46. Accompanying the check of the Storage Company to DeShazo was a statement which showed that his wool had been sold for a gross amount of $458.30, that a commission of $11.46 had been charged by the Storage Company, and that the sum of $329.96 had been paid on the government loan, including interest. This was the loan made by the bank.

When DeShazo received the check from the Storage Company, with enclosed statement showing that his wool had been sold, he went immediately to the Storage Company's office, and talked with Mr. Kinney and Mr. McKnight, who seem to have been in charge. We here quote DeShazo's testimony as to what then occurred:

"A. I was talking to Mr. Kinney and Mr. McKnight was there, and I believe it was Mr. Kinney who said that they had sold it. I asked why they sold it and he said they sold everybody's wool, and I asked why they sold my wool and they said they sold all of it just alike. I said, 'You didn't have any right to sell my wool,' and he said they did. I said, 'What right,' and he said, 'That is the way we do business.' I said, 'You didn't have any right to sell my wool because I had a Government loan on it,' and he said, 'That don't make any difference, they sold it anyway.' They argued they were not a storage house but a commission house.

"Q. Did you make an investigation about that?

"A. Everything I found was Wool Growers Central Storage Company: I didn't find anything about commission.

"Q. Did you look in the papers to see?

"A. Yes, and they said when I put the wool in there it was on consignment and that they had a right to sell it at any time. I said, 'You don't have any right to sell wool with a Government loan on it,' and they said, 'Yes, it is all the same.' I said, 'You know good and well you don't have the right to sell the

Government wool, and I don't figure you had that in your charge at all; it was stored by the Government,' and Mr. McKnight said, 'You might have something there.' He laughed and said, 'Maybe you can get a chance at us some day'."

Later, in DeShazo's evidence, appears the following testimony:

"Q. Mr. DeShazo, when did you go back to the wool house after that?

"A. I went twice that same day; as soon as I got the letter and then talked to different parties and that evening went back again. I tried to give them the check back and told them I would not take that price for the wool. They said there was nothing they could do about it, that it had already been shipped to Boston. I told them I wanted my wool back and would not accept that kind of price for it.

\* \* \* \* \*

"Q. Did they state they would replace your wool?

"A. No, sir.

"Q. What did they tell you they would do in connection with the wool?

"A. They never did say they would do anything; they said they had sold it and had a right to sell it because they were a commission house and not a storage house. I told them they were supposed to keep Government wool there and they said they had sold it before that way. I told them that was what I got the loan for; that if I was intending to sell it I would not have gotten the loan.

"Q. Did you go over there any more after that?

"A. Yes, late that afternoon after I had talked to several parties in town.

"Q. What did you tell them then?

"A. About the same; that I didn't want to sell my wool and would not accept that and tried to give them my check again. I shoved it through on the desk and they shoved it back. \* \*

"Q. Did you go gack any more after that?

"A. Yes, I believe the next day.

"Q. What did you say to them then?

"A. I asked them what they were going to do about it? \* \* \* Mr. Kinney said there was nothing they could do about it, that it had already happened and that it could not be recalled.

"Q. Did you go back any more after that?

"A. Yes, one time after that.

"Q. What was the occasion of oging over there that time?

"Q. I got Mr. Curtsinger and we went over htere and talked to them. They said there was nothing they could do about it; that they were a commission house and had a right to sell it."

After the happening of the above events, DeShazo, acting on the advice of his attorney that he surrendered no rights thereby, cashed the check of the Storage Company for $116.88. DeShazo filed this suit on December 16, 1939. It is shown that DeShazo received by the above transactions the full market price for his wool on the date it was sold; and for the purposes of this opinion we will assume that he received the full market price on the day he cashed the check.

If we properly interpret the opinion of the Court of Civil Appeals, it holds that DeShazo, by cashing the check for the net proceeds of his wool, sold under the circumstances above detailed, ratified the acts of the Storage Company in selling his wool, even though such sale was wrongfully made to his, DeShazo's, material damage. Also, we understand such opinion to hold that DeShazo's act in cashing the check of the Storage Company amounted to accord and satisfaction of DeShazo's claims for damages.

██ We are aware that it is a general rule that where two parties are in dispute as to what amount one owes the other, or where two parties are in dispute as to whether or not one owes the other at all, and one party accepts a sum of money or a check or property in settlement of the dispute, both paries are bound by the settlement. This general rule of law is too elementary to require the citation of authorities. It is also the rule that where one party converts the property of another and sells the same, the owner does not lose his right of action for damages against the person committing the conversion by merely accepting the proceeds, or a part thereof, derived from the sale. 26 R. C. L. 1145; Carlton Bros. & Co. v. Carter (Civ. App.), 140 S. W. 827; Baldwin v. G. M. Davidson & Co. (Civ. App.), 127 S. W. 562; Watson v. Coburn, 35 Neb. 492, 53 N. W. 477. We here quote the rule as announced in 26 R. C. L., supra:

" * * * However, the mere receipt of the proceeds derived from an unauthorized sale of the plaintiff's property will not necessarily estop him from treating such act as a conversion. Even though he knows of the sale at the time of such receipt, it must be remembered that he is entitled to compensation by reason of the conversion and he may therefore treat such payment as part compensation for his loss. * * *"

Of course, we do not hold that the receipt of the proceeds derived from converted property in no instance amounts to ratification or estoppel. Such receipt may or may not constitute ratification or estoppel, depending on the surrounding facts and circumstances. American Railway Express Co. v. Patterson Produce Co. (Com. App.), 12 S. W. (2d) 158. What we hold is that such acceptance alone does not constitute ratification, or work an estoppel.

■ According to the evidence offered by DeShazo, which we must accept as true, the trial court having withdrawn the case from the jury and rendered judgment for the defendant, he, DeShazo, did nothing but cash a check representing the proceeds of the sale of his own converted property, after he had protested such conversion, demanded his property back, and tendered the check back to the party who had wronged him. The cashing of this check under such circumstances did not amount to an act of ratification on the part of DeShazo, and neither did it estop him from prosecuting an action for damages against the one who had converted his property.

From what we have said, it is evident that we hold that if DeShazo cashed the check here involved under the circumstances shown by his evidence, he is not foreclosed thereby from recovering his damages, as defined by law, from those who converted his property.

■ It is the general rule that where one person converts the property of another and appropriates it to his own use, or sells or otherwise disposes of it, the measure of damages is the value of the property converted at the time of such conversion, with legal interest. On the other hand, it is the law that where the conversion is attended with fraud, willful wrong, or gross negligence, and the property converted is of changing or fluctuating value, the measure of damages is the highest market value of such property between the date of conversion and the filing of the suit. Early-Foster Co. v. Mid-Tex Oil Mills (Civ. App.), 208 S. W. 224, (writ refused), and authorities there cited. In the case at bar the evidence offered by DeShazo certainly raises an issue as to whether or not the Storage Company's act in selling this wool was attended with fraud, willful wrong, and gross negligence. In this connection there is evidence in this record tending to show that the market value of this wool was much higher between the date it was sold and the date this suit was filed. Further, there is evidence showing

that wool is a commodity of changing or fluctuating value. Finally, we think an examination of the evidence in this case, and an examination of the opinion in the Early-Foster Company case, supra, will demonstrate that the facts involved in the two cases are, in law, practically identical.

The judgments of the Court of Civil Appeals and the district court are both reversed, and this cause is remanded to the district court for a new trial.

Opinion delivered May 20, 1942.