**COMMODITY CREDIT CORPORATION et al.**

v.

**TRANSIT GRAIN COMPANY et al.**

Civ. A. No. 7826.

United States District Court
S. D. Texas,
Houston Division.

July 25, 1957.

528

Malcolm R. Wilkey, U. S. Atty., Sidney Farr, Asst. U. S. Atty., Houston, Tex., for plaintiffs United States and Commodity Credit Corp.

Fulbright, Crooker, Freeman, Bates & Jaworski, Charles Haden, Houston, Tex., for Ship Channel Nav. Dist.

Cantey, Hanger, Johnson, Scarborough & Gooch, J. A. Gooch, Fort Worth, Tex., Butler, Binion, Rice & Cook, Jack Binion, Houston, Tex., for defendants Transit Grain Co., Potishman and Scott.

McGregor & Sewell, Douglas McGregor, George O. John, Houston, Tex., for defendant Fellrath.

CONNALLY, District Judge.

This action is one by the United States of America and the Commodity Credit Corporation as plaintiffs to recover damages resulting from an alleged fraudulent conspiracy and course of dealing. The Court is vested with jurisdiction under § 1345 of Title 28 and § 714b of Title 15 U.S.C.A.

The Commodity Credit Corporation ("CCC" hereafter) is a wholly-owned agency and instrumentality of the United States. Insofar as concerns the present action, its function was to purchase, and thereafter ultimately to dispose of, large quantities of wheat. By reason of the policy of the Government to support the price of wheat in the United States, CCC bought at an artificial and supported price, in excess of the world free market. During the period in question it exported through the Port of Houston approximately 25,000,000 bushels of wheat.

Harris County-Houston Ship Channel Navigation District ("District") is a quasi-governmental agency created pursuant to Texas statute. Its function is to own and operate the facilities of the Port of Houston, including an elevator for the collection and storage of wheat. District is a nominal defendant here, brought in by the plaintiffs to assert what adverse interest, if any, it had in certain securities in the registry of the Court; but in fact is in the posture of a party plaintiff, asserting its own cause of action against one of the defendants.

The defendants are Transit Grain Company, Leo Potishman, Julian Scott and Johanetta Fellrath. Transit Grain Company ("Transit" hereafter) is a private corporation engaged in the purchase, sale and other branches of the grain business. Leo Potishman is its president and principal stockholder, and Julian Scott is vice-president and manager of its grain department. These three are referred to collectively hereafter as the "Transit defendants".

The other defendant was William L. Fellrath. Mr. Fellrath died after he had appeared in this action and his widow has been substituted as defendant in his stead. There has been no administration on the Fellrath estate, and Mrs. Fellrath is sued in her capacity as sole heir and beneficiary thereof as well as in her individual capacity. Fellrath, a long time employee of District, was first employed there in 1926. He became superintendent of the grain elevator in 1943, and served in that capacity until he was discharged as result of the matters giving rise to this litigation April 21, 1953.

The CCC alleges a cause of action against the Transit defendants and Fellrath. It contends that Potishman and Scott entered into an agreement with Fellrath whereby in return for the payment of large sums of money by Transit to Fellrath, in the nature of a bribe, Fellrath agreed to, and did, afford to Transit highly preferential treatment in the handling of its grain deposited in the District's elevator, at the expense of other depositors, primarily CCC. Specifically it is alleged that by reason of information given the Transit officials by Fellrath, they purchased and deposited in the elevator in the period of time from December 15, 1950 to July 12, 1951 approximately 650,000 bushels of low grade Canadian wheat;[1] and that such wheat was substituted for wheat of better grade of CCC by mixing and blending when vessels for export were loaded; and that the difference in value accrued to Transit's benefit. It is contended that CCC was damaged to the extent of this difference in value. Alternatively, it is contended that if no damage be shown, then nevertheless equity will not permit

1. Described as "sample grade Northern Spring wheat."

Transit to retain such profits, and that CCC should recover them under the theory of unjust enrichment.

The United States asserts a cause of action against the Transit defendants and Fellrath on a different theory. This comes about by reason of the participation of the United States in the International Wheat Agreement ("IWA" hereafter, 63 Stat. 2173 (1949)). Under terms of the IWA and its implementing legislation, International Wheat Agreement Act (7 U.S.C.A. §§ 1641, 1642) the United States as an "exporting country" was obligated to sell quantities of wheat abroad to certain "importing countries", at a price arrived at in a manner provided by the IWA, but comparable to the world free market. On such IWA shipments by CCC, the governmental agency entrusted with the performance of the obligation, CCC was paid its costs, from funds appropriated by the Government for that purpose. This included the difference between the higher domestic price which CCC had paid for the grain and the lesser price at which it was sold under the IWA program. The United States contends that its price support program was only for the benefit of domestic wheat and the growers thereof; and that by substitution of the 650,000 bushels of Canadian grain for a like quantity of domestic wheat which CCC placed in the elevator, the United States was caused to pay subsidy on this quantity of wheat improperly and unnecessarily. The United States seeks to recover the amount of such payment as its damage.

The Navigation District complains only of Fellrath. Its cause of action is bottomed on the allegation that he was a dishonest and unfaithful servant; that pursuant to the conspiracy and in return for the large sums of money from Transit,[2] he gave officers of that company confidential information as to the holdings of other customers and depositors, whereby Transit was able to trade at an advantage. The District seeks to recover the fruits of these payments, amounting to a total of $142,000, of which $118,700 was paid by Transit from February 1, 1949 until Fellrath's discharge in early 1953.[3]

By his own admissions and other evidence, these payments are traced directly into a group of securities, principally Series "E" U. S. Savings Bonds having a maturity value of some $90,000. They presently are in the custody of the Clerk of this Court, pursuant to orders entered in Criminal 11948, U. S. v. Potishman, Scott, Transit Grain Company and Fellrath. In this proceeding Potishman, Scott and Fellrath entered pleas of guilty to two counts of a ten-count indictment charging the making of false statements to an agency of the United States (CCC), all growing out of the matters here in issue.[4] These securities constitute the

---

2. And, to a much lesser extent, from some three or four other customers of the elevator.

3. Fellrath's income tax returns for the years 1948–1952 inclusive, show his "other income" (other than his salary from District) in 1948 to be $1,250. In 1949 it was $26,500; in 1950, $28,688.45. For these years the source of such "other income" is not detailed. For the years 1951 and 1952, "other income" figures are $41,148.51 and $47,846.45, respectively. For these years the totals are broken down showing, for 1951, interest from banks and savings associations of $308.51, and "brokerage" and "solicitation" payments of $40,800. Of the latter figure, $29,000 is reflected as coming from Transit Grain Company and the balance from four other grain concerns, all of which were customers of the elevator. The 1952 breakdown of "other income" shows interest of $301.45 and "brokerage" and "solicitation" totaling $39,700, of which $31,000 came from Transit.

4. Each individual defendant was sentenced to a fine of $20,000 which was paid, and to a period of confinement of 3 years, execution of which was suspended. All charges were dismissed against Transit Grain Company as it appeared that Potishman and Scott were sole owners thereof. The Court permitted Fellrath to withdraw and liquidate Series "E" bonds in sufficient number to pay his fine, and the original list has been reduced to that extent.

only asset of the Fellrath estate; and CCC, the United States, and District all make claim thereto. It is not alleged that Mrs. Fellrath knew of or participated in the conspiracy, and while she is named as a party in her individual capacity, no claim is made against her except insofar as she may have received the fruits of these payments.

Many of the facts are the subject of stipulation, and many others are shown indisputably by records of the U. S. Customs Service, of District and of Transit. On careful analysis I am convinced that there is little, if any, dispute as to what was done. There is sharp dispute as to whether what was done was tortious and actionable; and there is sharp disagreement as to the measure of recovery, if an action lies.

Properly to comprehend the theory of the actions asserted here, it is necessary to have an understanding of the operational practices followed by the Houston elevator, and apparently by others. The evidence which was heard affords a liberal education in grain warehousing.

There are means and methods through which the skillful operation of an elevator may result in an "overage" of grain (as to quantity), as well as an "up-grading" or increase in quality of all grain deposited. Thus after all warehouse receipts of depositors have been satisfied, there is a surplus of grain remaining as well as an increment of increased value of the grain deposited. The method whereby the excess in quantity comes about is relatively simple. The evidence in this case reflects three means which may bring about this result. No doubt there are others. First, there is always some spillage of grain in handling. On incoming grain, before it reaches the scales, is weighed and receipted for, and on outgoing grain after it has been weighed and measured, this loss is that of the customer. This spillage is salvaged by the elevator. Second, "dockage" is charged against incoming grain which contains dirt and foreign matter which may be removed by cleaning. This figure apparently is slightly weighted in favor of the elevator. Third, there is the "break of the beam". As I understand this practice, it means little more than that in the weighing of incoming and outgoing grain all doubt is resolved in favor of the house. This "overage" grain is no mean item. During the years 1948 to 1953 inclusive, almost three hundred million bushels of grain moved through the District's elevator. During the same period, without having bought a single bushel, the elevator sold in excess of 450,000 bushels of overage, for just under $1,000,000. This was done for its own account, and the profits retained by the elevator. Apparently this is common practice in elevator operation, and no complaint is made by the parties here of this item.

The means whereby the quality of the stored grain is increased is more complicated. It results from skillful mixing and blending of grain of different qualities when it is withdrawn from storage, usually for export. This is done by taking full advantage of the tolerances between the different grades of grain, and of all favorable grading factors which a lot of grain may possess. The best wheat is classified as Grade 1, with the Grades 2, 3, 4, 5 and "sample" constituting the lower grades. Normally there is a price differential of 1¢ per bushel between Grades 1 and 2, between 2 and 3, between 3 and 4, and 4 and 5. Sample grade normally commands a much lower price. There are a number of "grading factors" which determine the grade. To qualify as Grade 1, the wheat must weigh at least 60 pounds per bushel, must contain not more than 2% of damaged kernels, and not more than 1% of foreign material. To qualify as number 2, the wheat must weigh 58 pounds or more per bushel, contain not in excess of 4% damaged kernels and not in excess of 2% of foreign materials. Disregarding for the moment the other grading factors, to qualify for Grade 3, not in excess of 7% of damaged kernels is permissible; for number 4, not in excess of 10%; and for number 5, not in excess of 15%. Any wheat with a damage factor in ex-

cess of 15% is classified as "sample grade". Despite the fact that a particular lot of wheat may qualify as Grade 1 in all other respects, if it is deficient as to a single grading factor, its grade is reduced to a point within the tolerances of the lower grade. Thus a quantity of wheat might weigh 60 pounds per bushel, contain one-half of 1% of foreign material but show a 5% damage factor. Such wheat would be graded number 3, for despite the fact that its other characteristics were ample to qualify as number 1, the damage factor in excess of 4% would preclude a grade higher than number 3. There were 462 bins for the storage of grain in the District's elevator. Wheat is a fungible and while a customer might, for a price, have his grain stored "identity preserved", this was seldom done (except as to the Canadian wheat which was held under bond imposed by the Customs Service, as hereinafter reflected) and none of the CCC wheat was so stored. It was all commingled. When wheat was received at the elevator, it thus lost its identity, and all depositors understood that they would not receive in return their own grain, but would receive grain of like grade. So incoming grain was not segregated as to ownership, but in fact was segregated as to its grading factors.

It was when a customer ordered delivery of a quantity of grain of a particular grade against his stock in the elevator that the skill and experience of the elevator operator came into play. The wheat delivered was always a mix, drawn from various bins in the elevator. It was the purpose and intent of the elevator always to make delivery of a mix which met the grade specifications demanded, but by the barest margin. Without more, suffice it to say that by taking full advantage of the tolerances, and by skillfully combining quantities of wheat so that a particular deficiency in a grading factor in one lot was compensated for by an unduly high factor in another, invariably the lot of wheat delivered attained a grade in excess of that of its component parts. Thus over

a period of time by reason of this continuing increase in quality of grain delivered over that of grain received and receipted for, the stock of grain in the elevator seemed to lift itself by its boot straps, without expense to anyone. As result, the books of the warehouse showing the quantity and grades of wheat deposited, and for which the elevator was responsible, did not truly reflect its stock on hand. As an illustration, a customer may deposit 300,-000 bushels of number 2 wheat, and later order 300,000 bushels of number 2 loaded out for export. The elevator would appear to have satisfied its obligation to the customer. But when it appears that the 300,000 bushels of number 2 loaded out was a mix of 250,000 bushels of number 2, and 50,000 bushels of sample grade (worth perhaps 40 cents per bushel less than number 2), it is clear that someone stands to profit as the result. This is what gives rise to the present litigation.

From the foregoing it is apparent that knowledge by one depositor of the quantities and grading characteristics of large quantities of grain deposited by other customers might be of inestimable value to the former. He would know the amount and kind of low grade grain which might be absorbed by the grain then on deposit in the elevator without sacrifice as to grade—and might make certain to have that quantity on deposit at the opportune time. If it further should come to pass that the increase in value by reason of the up-grading was not prorated among the customers, but was credited only to the advantage of the one, indeed the opportunity was presented to turn a pretty penny.

Although overly simplified and condensed, that is precisely what transpired in the instant case. The Transit defendants do not deny that they made an agreement with Fellrath in late 1948 to favor them, nor do they deny the payments to him during the four and one-half year period of $118,700. While Fellrath's name appears very sparingly in the Transit records, and on only one of the twenty-six checks with which he was

paid, the Houston grain operations of Transit were treated on their own records, and referred to by their accountant in his testimony, as a "joint venture" with a 75% participation by Transit and 25% by Fellrath. The payments to Fellrath constituted 25% of the profit of the Houston operation. There is no direct evidence as to the terms of the agreement. At the time of trial Fellrath was dead. Neither Potishman nor Scott appeared during the course of the trial, nor did they testify by deposition or otherwise. On their behalf, it is suggested that the agreement was only that Fellrath furnish Transit with information of grain movements and deposits in the elevator, and it is further suggested that this information was obtainable from a careful analysis of vessel movements, car loadings, etc. readily available to the general public. But I am convinced that the agreement went much further, and was not nearly so innocuous as suggested. I find that Fellrath agreed to, and did, favor Transit (or the Transit-Fellrath joint venture) in every way possible at the expense of other depositors and perhaps of his employer as well. The course of dealing between these parties bears every badge of fraud.

With this background I pass to a consideration of the more detailed facts of the present action. Under date of June 1, 1950, CCC entered into a contract with District for the storage with the latter of CCC's grain, and shortly thereafter began a very heavy movement of grain through the Houston elevator. This contract contemplated that the wheat would be commingled and (with certain exceptions) that the warehouseman's obligation would be satisfied on his redelivery of grain of like grade; but the contract contained this very important qualification "it being specifically understood and agreed, however, that this provision shall not be construed as permitting the warehouseman to deliberately take advantage of the tolerances * * * or to depart from ethical warehousing practices." During the period from December 15, 1950 to March 4, 1952 (the period of

time of which CCC complains) CCC deposited 5,242,312.28 bushels of number 1 wheat; 17,320,382.29 bushels of number 2; 1,644,429.87 bushels of number 3; 375,890.84 bushels of number 4; 346,-880.10 bushels of number 5; and 191,-693.30 bushels of sample. It will be noted that this wheat was predominantly of excellent quality, with relatively minor quantities of grades 4, 5, and sample.

Beginning December 15, 1950 and continuing through 1951, Transit acquired and deposited in the Houston elevator 654,358.50 bushels of sample grade Northern Spring wheat, containing 30% or more damaged kernels. The wheat had been lawfully imported from Canada (by persons in no wise connected with Transit) but the duty had not been paid and the wheat was in Customs' bond. By reason of the high damage factor, it was classified by Customs as "unfit for human consumption" and carried a low duty, but this was somewhat of a misnomer as in fact it contained no harmful or deleterious substances, but was so designated because normally wheat of such grade is used only as animal feed. It was stored in the Houston elevator "identity preserved" and under lock and key. It could be removed only by consent and under supervision of a Customs officer.

This wheat cost Transit an average of $2.2235 per bushel on the rails in Houston. It was purchased, I am convinced, by reason of Fellrath's advice that he could dispose of it as number 2 wheat, and subsequent events have proved that he was entirely correct.

During the ensuing sixteen months on the loadout of each wheat ship at Houston, small quantities varying from a few hundred bushels to a maximum of about thirty thousand bushels were disposed of by mixing with larger quantities of better grain. Some fifty-two CCC vessels were so affected, and a much lesser number of private vessels.

The procedure was as follows. When the Hellenic Sky was to be loaded on December 30, 1950, for example, the CCC would advise Fellrath a few days prior to

her arrival that she would berth on the given date, and should be loaded with 360,000 bushels of number 2 wheat.[5] Fellrath then passed this information along to Dan Young, his assistant superintendent and the individual in charge of the mixing operations.[6] A study was then made of the grading factors of the lots of wheat in the various bins, and the quantity to be withdrawn from the different bins in order to develop the minimum number 2 mix, and to utilize the largest possible quantity of sample grade grain, was determined. Fellrath then would notify Customs who would send an officer to supervise the withdrawal from bond of the quantity of the Transit wheat. As the wheat was withdrawn from the several bins, it was mixed on a conveyor belt, was weighed and then loaded aboard the vessel. Samples were taken as it entered the ship. The calculations of Fellrath and Young were so accurate that not once did the mix fail to meet the test for grade. Of the 360,000 bushels lifted by the Hellenic Sky on December 30, 1950, 12,234.17 bushels were the Transit sample grade. This process continued until by the spring of 1952 all of the Canadian wheat had been disposed of.

In making proof of the quantities of this wheat mixed on CCC's vessels for export, the plaintiff has broken down the total period in which the wheat was handled into two parts, namely from December 15, 1950 to October 4, 1951, and from October 5, 1951 to March 4, 1952. During the first period U. S. Customs' records show in detail the quantities of such wheat lifted by each vessel. However, on October 4, 1951, Transit paid the duty on the remaining 237,900 bushels of bonded wheat, and thereafter this quantity was commingled and its identity lost. For the first period it is clear that 377,-359 bushels were introduced into CCC vessels and 39,100 bushels into vessels of private exporters. As to the second period plaintiff suggests that percentages be relied upon, and that it be considered that CCC vessels lifted the same percentage of Transit's Canadian wheat as total CCC exports bore to total Houston exports during this interval. If this method of proof be adopted, 159,060 bushels were exported as CCC wheat and 78,840 as privately owned. Or it has been suggested that as 90% of the Canadian wheat was introduced into CCC vessels, and 10% into private during the time for which the figures are available, this ratio be considered as continuing. If this be done then it would appear that 214,110 bushels were lifted by CCC vessels and 23,790 by private ships.

As quantities of the sample grade grain were disposed of in this fashion from time to time, it became necessary that Fellrath make book entries whereby the profits would flow to Transit, and to no one else. This was accomplished by one of two methods. First, Transit might make sale of a quantity of number 2 wheat which ostensibly it had on deposit in the Houston elevator to CCC or to another depositor. The purchaser would receive credit on the District's books for the stated quantity of number 2, and would settle with Transit on that basis. However, Transit's account would be charged only with the same quantity of sample grade.[7] In other instances by book entry referred to as "adjustments" and involving no other customer's account, Transit's account was simply charged with a given quantity of sample

---

5. This was always confirmed in writing, though frequently not until after the vessel had sailed.

6. After twenty-nine years of service with District, Young was discharged along with Fellrath as result of the matters here in issue.

7. Two instances of this nature resulted in the criminal convictions mentioned

above. On those occasions when Transit purported to sell quantities of number 2 on store in the Houston elevator to CCC, and Fellrath made the District's books reflect delivery by Transit to CCC of the stated amount of number 2, Transit did not have on deposit a sufficient quantity of number 2 wheat to make the transfer, but had only large quantities of sample. Hence the false statements.

grade, and immediately credited with a like amount of number 2.[8]

Conceding its own part in the conspiracy with Fellrath, the main thrust of the Transit defense is that CCC suffered no damage, in that it received back every bushel of grain deposited and of like or better quality.[9] Transit contends further that there was no fiduciary relation between itself and CCC and hence no basis for depriving Transit of its profits under the theory of unjust enrichment or constructive trust. In addition, a considerable portion of the Transit brief is devoted to minimizing and depreciating its profits from the Transit-Fellrath venture.

I am unable to agree with these contentions. I have no doubt that CCC and the other exporters who were victimized suffered actual damage although the amount is not susceptible of accurate proof. The extent to which each would have profited from the normal up-grading of the elevator stock in which each owned an aliquot part, save for the conspiracy, may not now be determined.

 This is not to say that the practice of loading out to meet only the minimum grade requirements in itself is unlawful or tortious, nor is it intended to hold that the practice which normally prevailed for the distribution of such profits as resulted was improper. Where low-grade grain was worked off in such fashion, the practice previously followed at Houston, and required by ethics and the custom in the trade, was to permit such profits to accrue to the customer whose vessel was loaded out, if he had on deposit a quantity of low-grade grain which might be thus absorbed. If he did not, then the benefits accrued jointly to all of the depositors whose wheat was commingled in the common mass.[10] Had all that was done here been the result of sound judgment or business acumen, in my opinion their fair share of profits might have been retained by Transit. The market place permits of shrewd and sharp though honest dealing. It is the conspiracy, the bribery, and the advantage taken of a confidential relationship which injects the element of illegality, and which deprives the conspirators of any right to retain their profits. The law requires good faith and fair dealing on the part of the warehouseman toward each depositor—and one who conspires with him to induce a breach of such duty, at the expense of the other depositors, stands in no better position than the dishonest warehouseman, though there be no fiduciary relationship between the one depositor and the other.[11] Neither

8. For the period December 12, 1950 to October 4, 1951, for which the records are available, plaintiff's brief contains a painstaking analysis of much of the voluminous documentary evidence received, and traces with meticulous care the manner whereby quantities of the Canadian grain were collected by Transit in the elevator; how such quantities were disposed of by mixing aboard the various vessels; and how Fellrath then manipulated the District's books to permit Transit to profit from each such transaction. Despite the large quantities of grain involved, the figures balance almost to the pound.

9. This is true. CCC and all other depositors who at any time had any low grade grain on deposit in the Houston elevator received some benefit from the up-grading process. Young testified that during his 29 years of employment no depositor was required to accept a mix grading lower than 3 although such depositors might have placed quantities of 4, 5, or sample grade in the elevator. In the past the elevator had protected itself against any customer who undertook to capitalize on this practice by declining to accept inordinately large deposits of low grade grain, and by requiring each customer to keep his deposits more or less in balance. During the period in question, CCC deposited relatively insignificant quantities of grade 4, 5, and sample and withdrew nothing less than 3, and profited to that extent.

10. Art. 5634, Revised Civil Statutes of Texas provides that the mass of commingled goods is owned in common by the depositors; and see 93 C.J.S. Warehousemen & Safe Depositaries § 14(c), p. 412 as to proportionate sharing of gain or loss to the commingled mass.

11. Kinzbach Tool Co. v. Corbett-Wallace Corp., 138 Tex. 565, 160 S.W.2d 509,

the dishonest servant nor his conspirator may retain this profit when called to account by the party to whom the duty was owed. Their liability is joint and several to the extent of their total profit (Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377; Marcus v. Otis, 2 Cir., 168 F.2d 649; 90 C.J.S. Trusts § 434, p. 832, et seq.).

■■■ Measuring its recovery by the extent of Transit's profit, CCC fixes this figure as the difference between Transit's cost of $2.2235 per bushel of the Canadian wheat and the market price of the number 2 wheat for which it was substituted. It contends that where the property converted is of fluctuating value, and where the taking is attendant by fraud, willful wrong, or gross negligence, the market price may be taken as of any date between the conversion and a reasonable time after discovery of the fraud (or perhaps until the date of filing suit), citing Early-Foster Co. v. Mid-Tex Oil Mills, Tex.Civ.App., 208 S.W. 224; De Shazo v. Wool Growers Central Storage Co., 139 Tex. 143, 162 S.W.2d 401; Cochran v. Wool Growers Central Storage Co., 140 Tex. 184, 166 S.W.2d 904. It is stipulated that number 2 wheat reached a price of $2.8125 per bushel on December 8, 1951. As it is shown that 377,359 bushels were lifted from December 15, 1950 to October 4, 1951, and an estimated 159,060 bushels thereafter (adopting the method of calculation most favorable to the defendant), CCC seeks to recover some $315,950, arrived at by multiplying this total by $0.589 profit per bushel.

Transit's estimate of its profit from the transaction is very much less. Based upon the testimony and calculations of its accountant, it arrives at a figure before taxes of $20,000, and after taxes of less than $5,000. I am unable to accept this testimony. In reducing its net profit to this figure, a number of assumptions are made which I consider unsound.[12] If the testimony of the accountant be accepted that the $118,700 paid Fellrath constituted his 25% of the venture's profit, then Transit's profit was three times this figure. Conceding that the Transit-Fellrath venture extended considerably beyond the scope of CCC's complaint,[13] nevertheless it would appear that Transit's figures are completely unrealistic.

The authorities clearly support plaintiff's contention that it is entitled to figure its damages in the manner suggested, and recovery will be allowed against Transit in that amount, save for a minor correction. The price of wheat on December 8, 1951 may not be availed of by CCC as to those quantities converted after that date. The highest price prevailing subsequent to each such conversion and prior to March 4, 1952, may be utilized.

As to the defendants Potishman and Scott, evidence shows that Potishman entered into the arrangement with Fellrath, and that both Potishman and Scott, in addition to a salary from Transit, were compensated in part for their personal services as officers of the corporation by a share of the profits. As all of the profits from the illegal transactions flowed to Transit, the facts mentioned above are insufficient to warrant a personal judgment against Potishman and Scott in view of the fact that the basis upon which the recovery is allowed is not the loss to CCC, but the unjust enrichment of the corporate defendant.

and cases there cited; Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303; Hunter v. Shell Oil Co., 5 Cir., 198 F.2d 485; Lawrence Warehouse Co. v. Twohig, 8 Cir., 224 F.2d 493; and see Scott on Trusts, Vol. 3, p. 2429, Par. 506, and cases there cited.

12. For example, the assumption that its profit per bushel on this Canadian wheat transaction was no more than its per bushel profit on all wheat it moved through the Houston elevator.

13. It extended over a longer period of time; included dealings in milo maize; and some of the Canadian wheat as shown was loaded aboard vessels of private exporters.

*Cause of Action Asserted by United States*

A large part of the wheat exported by CCC through the Port of Houston during the time in question was in fulfillment of the quota of the United States under the International Wheat Agreement. Other CCC exports were not under this program. The United States seeks to show that the defendants knew or were charged with knowledge of those ships carrying IWA wheat and those which were not; that there was some character of duty sounding in tort or contract, and of statutory or common-law origin, owed by the defendants to see to it that only grain of domestic origin was loaded on the IWA vessels; and that in mixing the Canadian wheat on such IWA vessels, the defendants breached this duty and incurred liability in the amount of approximately $0.80 per bushel, as the subsidy which the Government paid unnecessarily. The United States has failed to prove these essential elements of its case. One simple reason therefor is that CCC as owner and depositor of the grain never instructed Fellrath or any other employee of District that domestic grain was to be used exclusively in loading out any or all of those vessels.

There can be no doubt that the Executive Department of the United States in entering into the Agreement, and of the Congress in enacting the implementing legislation, contemplated that grain of domestic origin only would be used in meeting the quota of the United States. The Agreement and the Act form parts of the overall policy to subsidize and support the American wheat grower. With this in mind, it is indeed surprising that during the period in question there was no statute, executive order, rule, or regulation of any character requiring that only domestic grain be utilized in this program, or imposing either civil or criminal sanction against the use of imported grain.

As CCC was aware of the destination of its wheat, and of those vessels carrying IWA quota wheat, it is likewise surprising that the contract of storage between CCC and the Houston elevator contained no provision which prohibited the commingling of foreign wheat with CCC deposits, nor requiring that CCC withdrawals consist only of domestic wheat. In view of these considerations, the commingling of the foreign with the domestic, not in itself unlawful, breached no duty owing by Fellrath or the elevator to the plaintiffs and gave rise to no cause of action.

There are additional fallacies in the argument advanced on behalf of the United States. In taking the position that the mixing of the foreign grain with the domestic was wrongful, counsel assumes that all of the CCC grain was of domestic origin. There is no proof to that effect, and there is good reason to believe that at least some portions may not have been. The evidence shows frequent acquisitions by CCC of grain deposited in the Houston elevator by others, sometimes by purchase and on other occasions by "barter and exchange". There was never any requirement imposed by CCC in acquiring such grain that it be of domestic origin.

Finally, if for the moment it be assumed that the defendants, as men well versed in all aspects of the grain business, were aware that the Government desired that only domestic grain be placed aboard the IWA vessels, there is no sufficient showing of notice to Fellrath as to which vessels were IWA, and which were not, to impose liability. Admittedly, no oral or written instructions or advice to that effect were given. The Government relies upon a rather devious line of reasoning by which it contends Fellrath was charged with such notice. It is this. In meeting the quota of the United States under the International Wheat Agreement, the Economic Cooperation Administration from time to time would requisition of the Department of Agriculture quantities of wheat. This was accomplished by presenting a document styled "United States Government Agency Purchase Requisition", which found its way through the Department of Agriculture channels to CCC.

These requisitions, being a printed governmental form, clearly spell out that the wheat was for delivery to an "importing country" under the Agreement and carried the requirement that "wheat comprising this shipment must have been grown within the continental boundaries of the United States." This document thereafter remained secure in the CCC files. In ordering wheat out of the Houston elevator, a CCC official would notify Fellrath either by phone or by wire that a named vessel would berth on a given date, and should be loaded with a stated quantity and quality of wheat. Admittedly, no other instructions were contained in this initial communication. After the vessel loaded, her master issued to CCC as consignor, a bill of lading. Several days after the initial instructions to Fellrath, and frequently after the vessel had loaded and sailed, a written "confirmation" of the loading instructions was sent by CCC to Fellrath. This instrument, and the bill of lading, both referred by appropriate symbol to the original United States Government Agency Purchase Requisition. It is argued that Fellrath should have made inquiry from time to time of CCC as to the contents of such requisition; or he should have known from the fact that the vessel was bound for an "importing country" that probably the shipments were under the International Wheat Agreement, and that the Government desired that only domestic wheat be loaded thereon. The obvious answer to this contention is that if the Government desired that such be done, it need only have said so; and with CCC having failed in any manner to pass on the information before it, or to give instructions in this respect, the Government cannot now charge the defendants with knowledge thereof or breach of duty. It follows that the cause of action asserted by the United States must fail.

### Liability of Fellrath

Fellrath's conduct here was typically that of the dishonest servant who, without the knowledge of his master, conspires with a third person to make use of confidential information which has come to him in the course of his employment, for his own profit and that of the conspirator.[14] Uniformly it is held under these circumstances that the servant may not retain such profits.[15] They may be recovered by him whose confidence was abused. The only question is whether CCC or District should recover from Fellrath.

Between the two, CCC shows the greater equity. As bailee for hire District owed CCC the duties normally imposed by that relationship,[16] and through Fellrath's activity violated such duties. As the master of the servant whose dishonesty causes the loss, though otherwise blameless, District's claim must yield to that of the other innocent party; for it was District by whom Fellrath was employed and placed in the position which made the fraudulent conduct possible. Judgment in favor of CCC, measured by the profits to the Transit-Fellrath venture only insofar as CCC's wheat substitution be concerned, should run against Transit and Fellrath jointly and severally.

---

14. (1) The payments to Fellrath were very large, entirely disproportionate to his salary from District, which never exceeded $750 per month; (2) with a single exception he was paid throughout by bearer instruments or bank exchange, whereby his name and endorsement did not appear; (3) when rumor reached one of the CCC officers in early August, 1951 that Canadian grain was being loaded on CCC ships in Houston, this officer called Fellrath to inquire. Fellrath categorically denied that there was any Canadian wheat in the Houston elevator, qualified only by his statement that if there were, it had been deposited by CCC. At that time Transit had some 250,000 bushels in bond, and Fellrath had been loading out same at intervals of a few days for many months.

15. 89 C.J.S. Trusts § 151, p. 1048 et seq. and cases there cited; 54 Am.Juris. 173, Trusts, Par. 225 et seq. and cases there cited; Scott on Trusts, Par. 505–506; Slay v. Burnett Trust, 143 Tex. 621, 187 S.W.2d 377.

16. Kimbell Milling Co. v. Greene, 141 Tex. 84, 170 S.W.2d 191.

▇ Fellrath's liability to District is upon a different basis. It is measured not by the profits from substitution of ·CCC wheat, but by the amount of the improper payments received by Fellrath from all sources, shown earlier herein to have aggregated some $142,000. But District does not seek a money judgment for this amount. It seeks only to impress a constructive trust upon the securities heretofore impounded, and makes no further claim. District is entitled to this relief, subject to the prior claim of CCC.

In the event CCC secures full satisfaction of the judgment in its favor by recourse solely against Transit, then District will be allowed recovery of the securities in custody of the Court. In the event CCC is unable, or unwilling to look only to Transit, it may proceed against the securities or other Fellrath assets as necessary.

▇ The principal contention which has been advanced on behalf of Mrs. Fellrath is that the evidence is insufficient to warrant impressing a constructive trust upon the impounded securities. From what has gone before, it is apparent that I consider this point to be without merit and the evidence entirely sufficient. There is the statement of Fellrath, made after his guilty plea, to the effect that he had invested the proceeds of the payments so as best to provide for his wife (Fellrath then being in impaired health), and had put the money in life insurance and Government "E" bonds. Objection was made to this testimony by all parties on the ground it was hearsay. Regardless of the admissibility of this statement, however, the circumstances point indubitably to this' conclusion.

▇ In support of the admissibility of Fellrath's statement just mentioned,

the Government urges that as an admission against Fellrath's interest, it should be received against all parties. The matter really has no pertinence as to the Transit defendants, as it concerns only the manner of disposition of the monies which admittedly they paid. Entertaining some uncertainty in the matter, the objection of these defendants is sustained and the evidence not considered against them. Mrs. Fellrath, occupying the position of sole heir and beneficiary of her husband's estate, stands in his position and the evidence is considered against her.

The Fellraths had been married some twenty-five years at the time of his death in early 1954. Mrs. Fellrath has testified that neither acquired any property nor had any means of support other than Mr. Fellrath's earnings. She admits having knowledge of the fact that from time to time out of his savings Mr. Fellrath bought an occasional Government bond. Save for this, Mrs. Fellrath has denied any familiarity with matters financial, including those giving rise to this litigation. She has denied reading the income tax returns reflecting the "brokerage" payments to which her signature is affixed. She has stated she first learned of these payments to Fellrath, and of the inordinately large bond purchases, only after his death.[17]

The bonds surrendered to the Clerk of Court October 6, 1953, were purchased, and bore face or maturity value as follows:

| Date | Amount |
|---|---|
| 1941–1948 inc. | $ 9,850.00 |
| 1949 | 13,000.00 |
| 1950 | 5,000.00 |
| 1951 | 20,000.00 |
| January–February, 1952 | 20,000.00 |
| June–August, 1952 | 40,000.00 |
| April, 1953 | 5,000.00 |

17. I find it difficult to accept this last statement as entirely credible. Fellrath was discharged by his employer in April, 1953; he was indicted October 5, 1953; entered his plea of guilty October 30, 1953; and was permitted to withdraw $20,000 of the impounded securities November 12, 1953. By reason of the quasi-governmental character of the Navigation District, and the semi-public nature of Fellrath's employment, the matter received the broadest coverage in the local press and was repeatedly referred to as the "grain scandal." It seems most unlikely she knew nothing of these matters until her husband's death.

**540**

The bonds purchased June–August, 1952 in the amount of $40,000 were all Series "H" bonds. The $5,000 purchase in April, 1953 consisted of ten postal savings bonds, each in the amount of $500, half of which were taken in the name of William L. Fellrath, the remainder in the name of Johanetta Fellrath. All of the remaining securities are Series "E" bonds, payable to William L. "or" Johanetta Fellrath.

It is argued that Fellrath's statement that the Transit payments were used to purchase "Government E bonds" should be given literal interpretation, all contrary evidence disregarded, and the "H" bonds and postal savings bonds be found to have been purchased with other funds, perhaps with the payments from other depositors. I think not. I construe Fellrath's reference to the "E" bonds to mean all of the securities here in controversy.

Impressing a trust on the securities now impounded works no hardship on Mrs. Fellrath. Bearing in mind that the purchase price of the bonds was seventy-five percent of the face value, some $65,-000 which Fellrath received in "brokerage" payments is still unaccounted for. Additionally, though some of the bonds were purchased prior to 1948 and apparently are untainted, all of these early bonds, together with several thousand dollars purchased after 1948, were used by Fellrath to pay his fine; and the value of those remaining is much less than the total of the Transit payments.

Judgment will go in favor of CCC against Transit Grain Company and Mrs. Fellrath jointly and severally in an amount calculated as hereinabove indicated; though against Mrs. Fellrath such judgment may be satisfied only by recourse against the impounded securities or other assets constituting a part of the estate of William L. Fellrath or transmutations thereof. Subject to the foregoing prior claim of CCC, District is entitled to a judgment declaring its rights in and to the impounded securities in the nature of a beneficiary of a constructive trust, free and clear of any claims advanced on the part of Mrs. Fellrath.