**KOCH PETROLEUM GROUP, L.P., Plaintiff,**

**v.**

**ALLIANT ENERGY INDUSTRIAL SERVICES, INC., et al., Defendants.**

**Civil Action No. H–01–2057.**

United States District Court, S.D. Texas.

Aug. 12, 2003.

Osborne J. Dykes, III, Houston, TX, for Plaintiff.

James A. Dunn, Houston, TX, for Defendant Alliant.

Kevin J. Smith, Houston, TX, for Defendant Shoreham.

## Opinion on Title and Limitations

HUGHES, District Judge.

### 1. Introduction.

An oil company sold a gathering system—a pipeline and tank farm—to another company. The companies had another contract together dedicating the seller's reserves to use the pipeline. Despite their elaborate contracts covering rights to land and equipment, the parties did not account for the crude oil in the tank farm. Believing that title to the oil had passed with the tanks, the buyer later sold oil back to the seller. When the seller discovered that it had oil on deposit, it asserted its title to the oil, claiming a refund for what it had bought from the seller and the rest of the oil. Because the seller retained title, the buyer converted the oil when it refused redelivery.

### 2. Facts.

In 1998, Koch Pipeline Company and Shoreham Pipeline Company negotiated a deal to sell land, pipeline, equipment, and a tank farm. A separate contract covered the use of the pipeline. Shoreham and Northridge Marketing Corporation created Alliant South Texas Pipeline to hold the land and equipment.

The contracts expressly accounted for the crude oil in the pipeline—called line fill. Practicality precludes a seller from taking the line fill with him; he would have to pump some fluid into the line behind a barrier—called a pig—to push the oil out the downstream end. Sometimes there are references to marketable crude oil; the qualification "marketable" arises because some of the volume of oil in a pipeline or in a tank is water and sediment. It is a liability, not an asset.

At the time of the conveyance, the seller owned 72,199 barrels of oil stored in the tank farm. The parties' attentions were not drawn to this inventory. The contracts are silent about the passage of title to that oil. Whether this oil was sold or retained—to be delivered elsewhere or stored there for the seller's account—does not implicate uneconomic transaction costs like the line fill. Physically delivering the oil already stored at the downstream tank farm to a third-party or retaining it on deposit imposes no costs similar to clearing the line. The tank farm was designed to hold and redeliver oil on the owner's order.

When Alliant found the oil in its newly-acquired tank farm, it sold it to Koch in an unrelated transaction. From July through October 1999, Alliant delivered 63,309 barrels of oil to Koch in response to Koch's purchase orders. Alliant billed Koch, and Koch paid. Discovering its lost inventory on May 21, 2001, Koch asked Alliant to refund its payments and to deliver the

9,912 barrels remaining of the oil it had stored at the facility when the sale closed in 1998. Alliant refused. Koch sued.

### 3. Title.

 The inventory did not pass under the express terms of the sale documents. The buyer claims that it acquired the oil as an appurtenance of the facility. Personalty may pass in a land conveyance when it is (a) affixed or (b) functionally related to the land. When personalty is physically incorporated into the land it becomes realty. Personalty affixed to land takes the character of, and passes with, the land.

 Personalty is functionally related to the land when it would lose much of its economic utility if it were removed. The principle of annexation by function can apply to equipment, parts, fuel, and building materials on the site of an incomplete building. These items might be considered part of the structure and included in the sale. *See* Ray Andrews Brown, *The Law of Personal Property* § 16.3 (Walter B. Raushenbush ed., 3rd ed.1975).

The oil Koch stored in the tank farm was not affixed. The oil's utility is not functionally dependent on some other equipment that was needed or affixed. Its utility was purely as a marketable commodity. The function of the conveyed property—the tank farm—was precisely to hold oil for re-delivery. The function of the oil was to pass as a commodity through the tanks; it is parallel to inventory, not equipment. If Koch retained the oil, it would not have deprived Alliant of the value or efficiency of the conveyed land and fixtures.

Compare a cotton gin. A contract selling it might convey forklifts and spare belts in addition to the gin and compress. It would not implicitly convey title to 100 bales of cotton the seller forgot in the warehouse. *See Smith v. F.W. Heitman Co.*, 44 Tex.Civ.App. 358, 98 S.W. 1074 (1906, writ denied).

### 4. Bailment & Conversion.

 Because the contracts did not convey the oil, the new owner of the tanks on discovering inventory in them became the bailee of the goods. The seller shifted from being an owner in possession to being a bailor when it accidentally yielded possession of the oil along with the tanks. The facility's economic purpose was the business of possessing oil for the account of others—of being a bailee.

Alliant is the possessor of found goods. In 1840, Justice Story wrote:

> There is also ... a *quasi* deposit, which is governed by the same general rule, as common deposits. It is, where a party comes lawfully to the possession of another person's property by finding it. Under such circumstances, the finder seems bound ... as any voluntary depositary *ex contractu*. ...

Joseph Story, *Commentaries on the Law of Bailments*, § 84 (2d ed. 1840).

 If a bailee does not return the goods to the bailor on demand, the bailee converts them. If a bailee uses the goods in a way inconsistent with the owner's title, the bailee converts them. *See* Brown, *The Law of Personal Property* § 11.7 (Walter B. Raushenbush ed., 3rd ed.1975).

### 5. Conversion & Time.

Alliant says that, if it converted the oil, it did it back when it took control of it through taking control of the tanks; at that time, it says, it thought or otherwise acted as it were the owner. Alternatively, Alliant says that it converted the oil when it sold Koch its own oil. In either of those cases, it argues that Koch's conversion claim would be stale.

■ Because Koch had bailed a fungible commodity with Alliant, it was consistent with the nature of the goods and the law for Alliant to buy and sell oil in its possession to Koch and others as long as Alliant redelivered oil to Koch on its demand. This act—the refusal to redeliver—was the conversion. Grain elevators, for instance, are not expected to keep a bailor's specific grains of rice on account for redelivery; they are obliged to redeliver the same quantity of the same quality rice as it received. *See Kimbell Milling Co. v. Greene,* 141 Tex. 84, 170 S.W.2d 191 (1943); *Am. Petrofina, Inc. v. PPG Indus., Inc.,* 679 S.W.2d 740, 753 (Tex.App.—Fort Worth 1984). Alliant only had to deliver oil of the same grade and volume that it sold to Koch—not the exact oil it originally received from Koch. Alliant's thoughts are not significant; what matters is a manifest action inconsistent with the bailor's title.

Alliant converted the oil—creating Koch's claim—when it rejected the demand by Koch for the oil. The refusal is the operative date, not when the conveyance of the land and equipment took place nor when Koch bought some oil from Alliant. Koch requested the return of the oil on May 24, 2001. Alliant refused shortly after that, and Koch sued for conversion on September 24, 2001. Koch's suit is within the two-year limit set by Texas law. Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (2002). Koch did not, as Alliant insists, possess the oil at the time of its demand. Koch possessed oil it had bought from Alliant. Koch demanded compensation for the oil it had left in the tanks. In fact, Koch asked for its money back for the oil it had bought and for the return of the remaining barrels.

### 6. Damages.

Koch's damages are the highest market value of the oil from the time of the de-mand on Alliant until a reasonable time afterwards to cover the loss by buying in the open market. Koch will be fully compensated by the cost of cover and interest on it. *See Reed v. White, Weld & Co., Inc.,* 571 S.W.2d 395, 397 (1978); *De Shazo v. Wool Growers Cent. Storage Co.,* 139 Tex. 143, 149, 162 S.W.2d 401, 404 (1942). *See also Early–Foster Co. v. Mid–Tex Oil Mills,* 208 S.W. 224, 226–27 (1918); *Security State Bank of Tahoka v. Spinnler,* 78 S.W.2d 275, 277 (1935); *Romano v. Dempsey–Tegeler & Co., Inc.,* 540 S.W.2d 538, 540 (1976).

Rather than refund payments already received from Koch and redeliver 9,912 barrels, Alliant is obliged to pay Koch the market price for the full quantity it converted. Although Koch phrased its demand as part refund and part re-delivery, its request has the effect as if it had been for all of the oil because the earlier transaction was not part of the retained oil. Neither party at the time considered that it was a re-delivery, much less that both did.

### 7. Conclusion.

Koch contracted to sell land, equipment, and specified personalty to Alliant. Nothing about the contract or related contracts indicated an intent to convey the oil in the tank farm with the other property. Conversely, Alliant did not indicate in its operative papers that it expected to acquire any inventory along with the specified equipment, other than the line fill that was expressly covered. Nothing in the affiliation of the oil to the land, pipes, tanks, and other property even suggests that the oil's title should, as a matter of legal convention, pass with the equipment.

After the title to the oil was disputed, the parties fell into quarreling about sever-

al other aspects of their contractual relationship. Those will be heard next.