Michael J. REARDON, Albert E. Raizner, John Abukhalil, Richard A. Goldfarb, Milton Nirken, Osama Mikhail, Weldon Guest, Mordechaj Blankfeld, James T. Fox, Norman Rappaport, Mark Berger, Carol Sue Finkelstein, Gregorio Casar, Randolph W. Evans, Martin Barrash, Richard M. Barrett, M.D., P.A., Daniel Barrett, Cynthia A. Barrett, Robert Gordon, As Trustee of the Alan J. And Sherri Gordon Eisenman Family Trust, Larry I. Lipshultz, Goldfam, Ltd., William Lipsky, Tobias Samo, Gene Landon, Michael Munday, Deborah Brand–Fainstein, Harold L. Harris, Geoffrey D. Harris, Adrienne Harris, Ralph G. Harris, Mazel, Inc., Sheldon Harris, Harvey Fu-

son, Richard D. Klausmeier and Kay L. Klausmeier, As Trustees of the R.D. & K.L. Klausmeier Trust, Richard D. Klausmeier, Richard H. Stein, Edgar Goldberg, Boguslaw Godlewski, Christopher Godlewski, Ronald Golden, James Alexander, Robert K. Zurawin, Mohamed O. Jeroudi, and Thomas J. Mims, Appellants,

v.

LIGHTPATH TECHNOLOGIES, INC. and D.H. Blair Investment Banking Corp., Appellees.

No. 14–03–01208–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 20, 2005.

Rehearing Overruled Dec. 22, 2005.

Byron C. Keeling, Jeffrey L. Raizner, Houston, for appellants.

J. Clifford Gunter III, Tracy C. Temple, Warren W. Harris, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

In this complex securities fraud case, forty-five plaintiffs appeal from an adverse summary judgment. Appellants, shareholders in a technology company, brought suit against the company and others asserting a number of fraud-based claims, including common law fraud, statutory fraud under section 27.01 of the Texas Business and Commerce Code, securities fraud under the Texas Securities Act, and negligent misrepresentation, as well as a claim for breach of fiduciary duty. The trial court disposed of all claims by granting summary judgment on both traditional and no-evidence grounds. We affirm.

## I. INTRODUCTION

The shareholders challenge the trial court's disposition of their fraud-based claims. They assert that the company's representations fraudulently induced them to consent to a transaction that dispossessed them of a part of their ownership in the company in exchange for a type of share, "the E share," the value of which depended upon the company's achievement of certain milestones based on the company's stock price and pretax income. The shareholders allege that the company misrepresented and failed to disclose material facts that would have shown the shareholders that the E shares were highly unlikely to convert to shares of Class A common stock because LightPath was highly unlikely to achieve the necessary milestones. The trial court found, among other things, that the shareholders failed to produce

evidence that they suffered damages. We, too, conclude there is no genuine issue of material fact as to whether the shareholders suffered recoverable damages.

## II. Factual and Procedural Background

Appellants/plaintiffs Michael J. Reardon, Albert E. Raizner, John Abukhalil, Richard A. Goldfarb, Milton Nirken, Osama Mikhail, Weldon Guest, Mordechaj Blankfeld, James T. Fox, Norman Rappaport, Mark Berger, Carol Sue Finkelstein, Gregorio Casar, Randolph W. Evans, Martin Barrash, Richard M. Barrett, M.D., P.A., Daniel Barrett, Cynthia A. Barrett, Robert Gordon, as trustee of the Alan J. and Sherri Gordon Eisenman Family Trust, Larry I. Lipshultz, Goldfam, Ltd., William Lipsky, Tobias Samo, Gene Landon, Michael Munday, Deborah Brand–Fainstein, Harold L. Harris, Geoffrey D. Harris, Adrienne Harris, Ralph G. Harris, Mazel, Inc., Sheldon Harris, Harvey Fuson, Richard D. Klausmeier and Kay L. Klausmeier, as trustees of the R.D. & K.L. Klausmeier Trust, Richard D. Klausmeier, Richard H. Stein, Edgar Goldberg, Boguslaw Godlewski, Christopher Godlewski, Ronald Golden, James Alexander, Robert K. Zurawin, Mohamed O. Jeroudi, and Thomas J. Mims (referred to collectively hereinafter as the "Investors") are shareholders in appellee/defendant LightPath Technologies, Inc. (hereinafter "Light-Path"), whose written materials describe it as a manufacturer and marketer of optical glass and other products used in the telecommunications industry. Appellee/defendant D.H. Blair Investment Banking Corporation ("D.H. Blair") is a New York investment banking firm that served as the underwriter for the recapitalization and initial public offering ("IPO") at issue in this case.

In the 1980s, Leslie Danziger created a type of optical glass she named "Gradi-um." This glass, Danziger believed, would make it possible to do with one lens, or fewer lenses, what it takes conventional glass multiple lenses to do. Danziger founded LightPath, a company incorporated in Delaware, to design, develop, manufacture, and market Gradium to the optics and related industries. However, Gradium was a new product that presented many challenges, one of which was that it had never been produced commercially. From 1985 through 1994, LightPath solicited private funding from investors for research and development. During this period, investors were advised that LightPath had limited capitalization and significant debts, and that the commercialization of LightPath's technology was a "highly speculative venture." By 1994, it became apparent to the company that it could not survive without a major infusion of capital. At that time, LightPath had generated no significant revenue. Despite continual undercapitalization, the company made progress with its technology. In 1994, LightPath brought a single type of lens to market. Anticipating a production scale-up, LightPath sought to expand the number and type of lenses the company was creating.

To generate much-needed capital, Light-Path pursued the idea of an IPO with a number of investment banking firms, ultimately settling on D.H. Blair. In August 1995, D.H. Blair executed a letter of intent to underwrite an IPO for LightPath. D.H. Blair proposed an offering that initially would raise $8 million through the sale of stock and up to an additional $63 million through future warrant sales.

### Recapitalization Plan

As a condition of the IPO, LightPath sought to recapitalize. In proposing this transaction to its existing shareholders,

LightPath presented a two-part recapitalization plan in a proxy statement seeking approval of the transaction:

(1) **Reverse Stock Split.** The number of shares of existing LightPath stock (including those allocated for debt conversion and stock options) would be reduced through a 1–to–5.5 reverse stock split, which would effectively reduce the number of outstanding shares from 5.5 million to 1 million.[1] If a majority of LightPath shareholders approved the reverse split, Class A common stock ("A shares") would be issued to effect this stock split.

(2) **E Shares.** LightPath would distribute, as a "non-taxable stock dividend," escrow shares—called "E shares"—to pre-IPO shareholders. All holders of A shares were to receive four E shares for every post-split A share. The E shares would retain voting power, but they would be non-tradeable unless and until LightPath reached certain performance milestones. These milestones would be triggered should LightPath achieve certain targets for the price of it's a shares and/or for its pretax income. The E shares would be redeemed for nominal value unless they converted to A shares by 2000.

LightPath, through Danziger, who was then its President and Chairman of the Board, told the Investors that the company could not effectively market and sell GRADIUM products or fund the planned expansion of its manufacturing operations without the IPO. In September 1995, a majority of shareholders approved the proposed recapitalization plan, and the reverse stock split was accomplished. Every 5.5 shares of Class A stock were redeemed for one share, and LightPath distributed E shares to its existing shareholders.

The IPO offered 1.6 million units. A single unit in the IPO was sold for $5.00. Purchasers received one A share and two warrants per unit, and all 1.6 million units, plus 240,000 in over allotment, were sold. The IPO raised $9.2 million in capital for LightPath. After the IPO, shareholders exercised their warrants, and the IPO raised more than $65 million. Despite the success of the IPO, LightPath did not achieve the E share financial milestones set forth in the proxy statement. Consequently, the E shares did not convert to A shares. The Investors filed suit in June 2000.

### The Investors' Claims

The Investors asserted claims of fraud, statutory fraud under Section 27.01 of the Texas Business and Commerce Act, securities fraud under the Texas Securities Act, negligent misrepresentation, and breach of fiduciary duty. The Investors alleged that LightPath misrepresented and failed to disclose material information that the Investors would have found important in approving the recapitalization and IPO transaction, fraudulently inducing the Investors to consent to a transaction that decreased their interest in LightPath. The Investors assert that LightPath misrepresented and failed to disclose facts that would have shown the Investors that the E shares were highly unlikely to convert to A shares because LightPath was highly unlikely to achieve the necessary milestones. The Investors also alleged that LightPath made a material misrepresentation that the post-

---

1. Following a 1–to–5.5 reverse stock split, a shareholder with ninety-nine pre-split shares would have eighteen post-split shares, but both her share of ownership of the company and the total worth of her investment would remain the same. *See Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 738 N.Y.S.2d 658, 764 N.E.2d 958, 960 (2001).

IPO value of the E shares would be five dollars per share.

In addition to suing LightPath, the Investors also sued D.H. Blair, Danziger, Donald Lawson, LightPath's former President and Chief Executive Officer, and Milton Klein, a former director of LightPath. D.H. Blair, Danziger, and Lawson all filed special appearances, which the trial court denied. On interlocutory appeal, this court affirmed the trial court's order denying Danziger's and Lawson's special appearances, but reversed the trial court's order denying D.H. Blair's special appearance. *See D.H. Blair Inv. Banking Corp. v. Reardon,* 97 S.W.3d 269 (Tex.App.-Houston [14th Dist.] 2002, pet. dism'd w.o.j.). The Investors subsequently nonsuited their claims against Danziger, Lawson, and Klein. Under this court's mandate from the interlocutory appeal, the trial court dismissed the claims against D.H. Blair, leaving only the Investors' claims against LightPath.

## LightPath's Motions for Summary Judgment

LightPath moved for traditional and no-evidence summary judgment, asserting the following grounds:

- LightPath did not make any material misrepresentations or omissions.
- The Texas Securities Act does not apply because any alleged material misrepresentations or omissions by LightPath did not occur in the context of a sale of securities.
- The Investors cannot recover because they have suffered no damages.
- LightPath did not owe the Investors a fiduciary duty.

The trial court granted this motion and rendered a final judgment dismissing all of the Investors' claims against LightPath. The trial court specifically based its judgment on all of the above-stated summary-judgment grounds.

### III. Issues Presented

The Investors raise the following issues for appellate review:

**Misrepresentation**

- Did the trial court err in granting summary judgment in favor of Light-Path on the ground that LightPath conclusively disproved the making of a material misrepresentation or omission?
- Did the trial court err in granting summary judgment in favor of Light-Path on the ground that the Investors failed to produce evidence that Light-Path made a material misrepresentation or omission?

**Texas Securities Act**

- Did the trial court err in granting summary judgment in favor of Light-Path against the Investors' securities fraud claim on the ground that Light-Path conclusively disproved that an alleged material misrepresentation or omission occurred in the context of a sale of securities?
- Did the trial court err in granting summary judgment in favor of Light-Path against the Investors' securities fraud claim on the ground that the Investors failed to produce evidence that an alleged material misrepresentation or omission occurred in the context of a sale of securities?

**Damages**

- Did the trial court err in granting summary judgment in favor of Light-Path on the ground that LightPath conclusively disproved that the Investors suffered damages?
- Did the trial court err in granting summary judgment in favor of Light-Path on the ground that the Investors

failed to produce evidence that they suffered damages?

**Personal Jurisdiction**

● Did the trial court properly conclude that it could exercise personal jurisdiction over D.H. Blair?

The Investors do not challenge the trial court's dismissal of their breach-of-fiduciary-duty claim.

## IV. STANDARDS OF REVIEW

In reviewing a traditional motion for summary judgment, we take as true all evidence favorable to the nonmovant, and we make all reasonable inferences in the nonmovant's favor. *Dolcefino v. Randolph*, 19 S.W.3d 906, 916 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). If the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *Id.*

■ In reviewing a no-evidence motion for summary judgment, we ascertain whether the nonmovant pointed out summary-judgment evidence of probative force to raise a genuine issue of fact as to the essential elements attacked in the no-evidence motion. *Id.; Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 206–08 (Tex.2002). We take as true all evidence favorable to the nonmovant, and we make all reasonable inferences therefrom in the nonmovant's favor. *Dolcefino*, 19 S.W.3d at 916. A no-evidence motion for summary judgment must be granted if the party opposing the motion does not respond with competent summary-judgment evidence that raises a genuine issue of material fact. *Id.* at 917.

## V. ANALYSIS

If the trial court was correct in its determination that summary judgment on all of the Investors' claims is appropriate because the Investors suffered no damages, then it would not be necessary for this court to reach most of the Investors' other issues. Therefore, we will focus on the issue of whether the evidence raises a genuine issue of material fact regarding the Investors' alleged damages, after first addressing a liability issue.

**A. Is there a genuine issue of material fact as to whether LightPath represented that the post-IPO value of the E shares would be five dollars per share?**

■ The Investors assert that there is a genuine issue of material fact as to whether LightPath represented that the post-IPO value of the E shares would be five dollars per share. The Investors base this argument on the proxy solicitation letter that LightPath sent the Investors regarding the IPO ("Proxy Letter") and alleged admissions by Danziger at her deposition that LightPath made such a representation. The Proxy Letter states:

We are pleased to inform you that LightPath has entered into a Letter of Intent for a "firm commitment" underwriting with New York City-based D.H. Blair Investment Banking Corporation for a public offering of LightPath Units. Each Unit will consist of one share of Class A Common Stock and two warrants, as explained in detail in the enclosed Notice and Proxy Statement. . . .

The Board of Directors is very enthusiastic about this proposed [IPO]. The deal structure as proposed by the Letter of Intent, which is described in the enclosed Proxy Statement, with A shares and E shares and a $5.00 Unit Offering price, is not unusual for this type of "early stage company" financing. The Board is pleased with the small reduction in the aggregate number of shares held by current LightPath shareholders

(10% from 5,500,000 to 5,000,000) and that, following the Offering and until warrants are exercised, the current shareholders as a group retain voting control over the affairs of our Company

. . .

. . .

The structure of this financing, as proposed by the Letter of Intent, is detailed in the enclosed Notice and Proxy Statement. The following summarizes the terms:

1.) 1.6 Million Units, consisting of one share of Class A Common Stock and two warrants, will be offered for a Unit price of $5.00 for a total of $8,000,000, with an option to the underwriter to sell an over-allotment of up to an additional 15% of the Units offered, or an additional 240,-000 Units. If the over-allotment is sold in full, the gross proceeds will be $9,200,000. Based on the $5.00 Unit price, the post-IPO market valuation is estimated at $33–34.2 Million depending upon the sale of the over-allotment.

. . .

6.) The Class E–1, E–2, and E–3 shares will automatically convert to Class A Common shares (on a one-for-one basis) upon the achievement by the Company of specific performance milestones (described in the enclosed Proxy Statement) which have been set by the underwriter and agreed to by the Company; they are based on discounted net profit targets from our Business Plan. The E shares may not be sold, assigned or transferred until converted to A shares. If certain milestones are not met, the corresponding Class E stock is subject to redemption in September, 2000.

The proxy statement enclosed with the proxy letter accurately stated the milestones that had to be met before any of the E shares would convert into A shares. It also stated that on September 30, 2000, all E shares not previously converted into A shares would be redeemed by LightPath for $.00001 per share.

After reviewing the record under the applicable standard of review, we conclude that there is no genuine issue of material fact as to whether the Proxy Letter contains a representation that E shares would have a five dollar per share value after the IPO. The Proxy Letter does not contain such a representation. The Proxy Letter states that the units to be sold in the IPO will consist of one A share and two warrants to purchase A shares, priced at five dollars per unit. The Proxy Letter states that the anticipated IPO would generate $8 million to $9.2 million depending on sale of the over-allotment. In the sentence that the Investors claim constitutes a representation that the E shares would have a value of five dollars per share, the Proxy Letter states that, based on an IPO price of five dollars per unit, "the post-IPO market valuation is estimated at $33—34.2 Million depending upon the sale of the over-allotment." As a matter of law, this statement is not a representation that the E shares will be worth five dollars per share. The Proxy Letter does not state a value for the A shares or for the E shares. The Proxy Letter does not state who estimated "the post-IPO market valuation" of Light-Path to be $33—34.2 million. Using a five dollar per unit price, the sale of 1.6 million units would generate $8 million. The underwriter also had an option to sell an over-allotment of up to 240,000 more units, which would generate up to an additional $1.2 million. Even if one subtracts from this range the range of amounts that might be raised in the IPO, that would only indicate that, other than this amount, "the post-IPO market valuation" is estimated to be $25 million. The Proxy Letter and enclosed Proxy Statement state

that the E shares may not be sold or assigned until converted into A shares and that they will not convert to A shares unless specific milestones are achieved. As a matter of law, the Proxy Letter does not contain a representation that the E shares would be worth five dollars a share.

The Investors assert that Danziger admitted at her deposition that LightPath made such a representation. At the time of her deposition, Danziger was no longer an officer of LightPath, although she was a director. First, the testimony in question consists of Danziger's answers to questions from the Investors' counsel regarding the Proxy Letter. Danziger does not testify regarding any allegation of the post-IPO value of the E shares not contained in the Proxy Letter. Second, Danziger states that she is not sure how the calculation of $33—34.2 million was done and that she does not remember the basis for it. Danziger also states that the E shares were clearly not tradeable. In a series of leading questions, counsel for the Investors elicited affirmative answers from Danziger as to the following propositions:

- The old shareholders in the reverse stock split were going to get one million A shares at five dollars per share, which totals $5 million.
- $5 million of the $33 million valuation comes from the value of the old shareholders' stock.
- $8 million would be generated from the IPO.
- Subtracting $5 million and $8 million from $33 million leaves $20 million, which divided by four million E shares is five dollars per E share.

Danziger then testified, in answer to leading questions, that the Proxy Letter stated that the E shares would have a value of five dollars per share. Although Danziger signed the Proxy Letter, her testimony more than five years later does not add words to the document. The Investors base their argument on deductions and inferences from the $33—34.2 million market valuation mentioned in the letter; however, at her deposition, Danziger stated she did not remember the basis of the calculation of $33—34.2 million. Furthermore, her admissions are not binding on LightPath as a judicial admission, and they are conclusory statements about the Proxy Letter that do not raise a genuine issue of material fact. *See Coastal Transport Co., Inc. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex.2004) (stating that even unobjected-to conclusory testimony does not raise a fact issue); *United States Fid. & Guar. Co. v. Carr*, 242 S.W.2d 224, 228 (Tex.Civ.App.-San Antonio 1951, writ ref'd) (explaining that mere testimony is not intended as a waiver, stipulation, or judicial admission and that testimony is not a judicial admission). Therefore, the trial court correctly granted summary judgment as to the alleged misrepresentation by LightPath in the Proxy Letter that the E shares would have a post-IPO value of five dollars per share.[2] In addressing the Investors' arguments that they raised a genuine issue of material fact as to damages, we presume for the sake of argument that they raised a genuine issue of material fact as to their other allegations of fraud.

**B. Is there a genuine issue of material fact regarding the Investors' alleged rescission damages based on the testimony of Otto Meyers?**

The Investors also assert that the deposition testimony of their expert Otto

**2.** Therefore, we need not address the Investors' argument that the trial court erred in granting a no-evidence summary judgment as to their damages based on their alleged benefit-of-the-bargain damages arising from this alleged misrepresentation.

Meyers raises a genuine issue of material fact as to their alleged damages under the remedy of rescission. In his deposition, Meyers testified as follows:

- His calculations presume that there is a legal remedy of rescission under which the Investors would receive the payment for the number of E shares they tendered to LightPath based on the closing price of LightPath A shares the day before the tender.
- Under this model, Meyers testified that the holders of 483,593 E shares that were tendered to LightPath on September 27, 2000 would be entitled to rescission damages of $30,424,045 based on the closing price for A shares the previous day of $44.938 per share and based on an addition of 40 percent for attorney's fees.
- Under this model, Meyers testified that the holders of 18,299 E shares that were tendered to LightPath on February 22, 2001 would be entitled to rescission damages of $ 458,061 based on the closing price for A

shares the previous day of $17.88 per share and based on an addition of 40 percent for attorney's fees.[3]

- The Investors' aggregate rescission damages are $30,882,105.

The remedy of rescission is supposed to return the Investors to their position before the alleged fraud. *See Texas Capital Sec., Inc. v. Sandefer,* 58 S.W.3d 760, 773–74 (Tex.App.-Houston [1st Dist.] 2001, pet. denied). Meyers does not calculate or otherwise account for the consideration, if any, that the Investors gave to receive the E shares.[4] We conclude that, as a matter of law, the damages calculated by Meyers would not return the Investors to the positions they held before the IPO. Therefore, Meyers' testimony does not raise a genuine issue of material fact as to the Investors' alleged damages under a rescission remedy.[5]

### C. Is there a genuine issue of material fact regarding the Investors' alleged rescission damages based on the testimony of William Nicoletti?

3. Our record contains no affidavit or expert report from Meyers.

4. LightPath argues the Investors gave no consideration; whereas, the Investors claim the consideration was their consent to have their percentage ownership in LightPath diluted by the IPO transaction. We need not address these arguments.

5. The Investors do not assert that Meyers's testimony raises a genuine issue of material fact as to any alleged benefit-of-the-bargain damages; however, even if this argument were before us, we would reject it. It would be speculative as a matter of law to award the Investors damages as if all of their E shares had converted. *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 49–50 (Tex.1998). The Investors do not allege that LightPath induced them to approve the IPO transaction by representing that the E shares were certain to convert to A shares. Rather, in their live petition they

allege LightPath "represented that if, after the IPO, LightPath achieved certain financially related milestones, the old shareholders would receive a share of common stock for each E-share, on a one-to-one basis." The Investors further allege LightPath represented that "the E shares, although contingent, had a real and certain value and were not just a speculative gamble in the future." Although the Investors do allege that, after the IPO had been consummated, Danziger told an E shareholder that the milestones were sure to be met, this alleged statement could not have induced any of the Investors to approve the transaction. Although the Investors allege that LightPath represented that the chances of conversion were much higher than LightPath allegedly knew they were, a very high chance of conversion is not the same as a certainty of conversion. Therefore, even under a benefit-of-the-bargain measure of damages, it would be inappropriate to award the Investors damages as if all of their E shares had converted to A shares.

The Investors also assert that the deposition testimony of their expert William Nicoletti raises a genuine issue of material fact as to their alleged damages under the remedy of rescission. In his deposition, Nicoletti testified as follows:

- If the LightPath shareholders had known that there was no real chance that the E shares would convert or that D.H. Blair had valued the business at $5 million before the IPO, then they would not have approved the proposed recapitalization involving the IPO.
- If the LightPath shareholders failed to approve this transaction, then they would have renegotiated the terms of LightPath's recapitalization with LightPath, and then LightPath would have to have renegotiated with D.H. Blair.
- Nicoletti does not know that it would have been practical for LightPath to have negotiated with all of its shareholders, but he believes LightPath would have negotiated with some of the influential shareholders. Other than Dr. Michael Reardon, Nicoletti does not know who the influential shareholders of LightPath were, but he knows that LightPath knew who they were.
- It is reasonable to assume that an appropriate compromise in this renegotiation would have been for Light-Path and D.H. Blair to agree that one Class A warrant would be issued for each A share held prior to the IPO.
- Nicoletti bases his damage calculation on the presumption that each Investor would have received a Class A warrant in the renegotiated IPO. Then, he calculates the value of that warrant by presuming that the Investors would have exercised the warrant just before the redemption date of February 9, 2000, when LightPath A shares were trading at $33 per share.
- Based on an exercise price of $6.50 per warrant, each warrant holder would realize a profit of $26.50 per warrant, plus, under the terms of the Class A warrant, they also would receive a Class B warrant.
- Nicoletti presumes the Investors would have exercised their Class B warrant just before the June 13, 2000 redemption date for these warrants.
- Under this calculation, Nicoletti determined that each holder of an A share should be awarded $50.25 based on the value of the Class A warrant that he believes they would have received in the renegotiated transaction.

As noted, the remedy of rescission is supposed to return the Investors to their position before the alleged fraud. *See Texas Capital Sec., Inc.*, 58 S.W.3d at 773–74. Nicoletti does not calculate or otherwise account for the consideration, if any, that the Investors gave to receive the E shares. We conclude that, as a matter of law, the damages calculated by Nicoletti would not return the Investors to the positions they held before the IPO. *See id.* Therefore, Nicoletti's testimony does not raise a genuine issue of material fact as to the Investors' alleged damages under a rescission remedy.

Furthermore, Nicoletti piles speculation upon speculation. He presumes that the LightPath shareholders would have rejected the proposed IPO absent the alleged fraud, yet he testified that, at the time of his deposition, he had not yet talked to any LightPath shareholder or to any of the Investors. There is no evidence in our record that Nicoletti ever talked to any of the LightPath shareholders at any time. Nicoletti also speculates that some of the influential LightPath shareholders would have negotiated with LightPath for a

transaction involving the receipt of Class A warrants and that D.H. Blair would have agreed. Again, there is no evidence that Nicoletti talked to any LightPath shareholder, and he testified that the only influential shareholder he knew of was Dr. Michael Reardon. Nicoletti continues his speculation by presuming that, over a five-year period during which, under his analysis, the Investors could have exercised their warrants, the Investors, in fact, would have exercised their warrants at the end of this period in February 2000. He further speculates that the Investors would have exercised their Class B warrants in June 2000. Nicoletti's testimony rests on one fragile assumption after another. It would be speculative as a matter of law to award the Investors the damages calculated by Nicoletti.[6] *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 49–50 (Tex.1998).

The Investors also cite different calculations by Nicoletti of purported rescission damages. These calculations are substantially similar to Meyers's testimony. They presume that all of the Investors' E shares would have converted to A shares and values these shares based on the date in 2000 on which the Investors demanded rescission. This testimony does not raise a genuine issue of material fact for all of the reasons stated in section V. B., above, as to Meyers's testimony.

Nicoletti also testified regarding a damage calculation based on the highest intermediate value of the A shares—$65.31 in the first quarter of 2000. Nicoletti himself testified that it would not be reasonable to presume that the Investors would have exercised their warrants and then sold their A shares at the highest price. On appeal, the Investors do not rely on this damage testimony, although they urge the applicability of the highest intermediate value in an equitable rescission remedy. To the extent the Investors rely on a highest-intermediate-value theory as part of their alleged equitable rescission remedy, there is no sound basis to apply such a theory. The Texas cases cited by the Investors which allegedly apply the "highest intermediate value" theory of damages are conversion cases and are not applicable to the facts of this case. *See Gallagher v. Jones,* 129 U.S. 193, 200, 9 S.Ct. 335, 336, 32 L.Ed. 658 (1889) (holding that the measure of damages action against a broker for conversion of his principal's stocks is the highest intermediate value reached by the stocks between the time of sale and a reasonable time after the owner has received notice of it to enable him to replace the stocks); *Reed v. White, Weld & Co., Inc.,* 571 S.W.2d 395, 397–98 (Tex.Civ. App.-Texarkana 1978, no writ) (holding that damages for wrongful sale of stocks or bonds is highest intermediate value of stock or bonds between time of its conversion and reasonable time after owner has received notice of conversion to enable him to replace stock).[7]

---

**6.** The Investors do not assert that Nicoletti's testimony raises a genuine issue of material fact as to any alleged benefit-of-the-bargain damages; however, even if this argument were before us, we would reject it. Benefit-of-the-bargain damages seek to compensate the defrauded party for the profits that would have been made if the bargain had been performed as expected. *Formosa,* 960 S.W.2d at 50. There is no evidence that LightPath represented to the Investors that they would receive warrants as part of the IPO transaction. Therefore, Nicoletti's testimony does not raise a genuine issue of material fact as to any alleged benefit-of-the-bargain damage theory.

**7.** In the trial court, the Investors cited other conversion cases. *See De Shazo v. Wool Growers Central Storage Co.,* 139 Tex. 143, 162 S.W.2d 401, 404 (1942) (holding in a wrongful conversion of wool, the measure of damages is the highest market value of such

We have found no Texas case applying "highest intermediate value" theory as part of a rescission remedy in a securities fraud case. The federal securities fraud case that the Investors cite does not apply a "highest intermediate value" theory; rather, it allows the jury to determine a reasonable time in the future when the claimants would have sold their stock, not necessarily the highest value of the stock. *See Dupuy v. Dupuy*, 551 F.2d 1005, 1024–25 (5th Cir.1977) (holding that in a Rule 10b–5 case, a defrauded seller of corporate stock may generally recover difference between price for which he sold his stock and price he would have received absent misrepresentation or omission; if the jury decides he would not have consummated sale, it may then award difference between sale price and value of stock at a reasonable time in the future). In any event, in light of the Texas Supreme Court's analysis in *Miga v. Jensen*, we decline to embrace the "highest intermediate value" theory of rescission advocated by the Investors. *See* 96 S.W.3d 207, 213–17 (Tex.2002).

In *Miga*, defendant Jensen gave his employee, plaintiff Miga, an option to buy stock in Pacific Gateway Exchange ("PGE"). *See id.* at 209. The relationship between Jensen and Miga deteriorated, and Miga signed a "termination agreement." *Id.* For nine months after his termination, Miga tried to exercise the PGE option. *Id.* Each time, Jensen refused and stated that Miga had released the option. *See id.* Miga then sued to recover for damages resulting from Jensen's refusal to honor the option. *Id.* Jensen argued that contract damages must be limited to the value of the PGE stock at the time Miga "resigned." *Id.* The jury found for Miga on all issues and awarded Miga "lost prof-

its." The court of appeals upheld the "lost profits" award, reasoning that the Texas Supreme Court's decisions in *Randon v. Barton* and *Calvit v. McFadden* support measuring Miga's damages as the option's highest market value between the date of the breach and trial because Miga could not easily obtain PGE stock elsewhere at the time of the breach. *See Randon v. Barton*, 4 Tex. 289, 293 (1849) (applying an exception to the general rule and allowing damages for the highest value of the article between the time of trial and the time of breach because the purchasers had paid the contract price in advance); *Calvit v. McFadden*, 13 Tex. 324, 325–26 (1855) (applying the exception to the general rule to the sale of personal property when the purchase price was paid in advance).

The Texas Supreme Court rejected this position and found that the *Randon* damages measure (assuming that it is viable today) was inapplicable to the facts in *Miga*. *See Miga*, 96 S.W.3d at 215. For example, Miga did not pay in advance for his stock interest. The *Miga* court held that the value of stock should be measured at the time of breach, rather than sometime in the future. *Id.* The Texas Supreme Court opined:

> It was far from certain in December 1994 that the value of the stock would appreciate as it did. While Jensen ultimately benefitted from this appreciation, he also assumed the risk that the investment would be lost, just as any stockholder does. To award Miga damages based on the appreciated value of the stock would be to make him better off than he would have been had the agreement been honored by giving him an

property between the dates of conversion and the filing of the suit); *Patterson v. Wizowaty*, 505 S.W.2d 425, 427 (Tex.Civ.App.-Houston [14th Dist.] 1974, no writ) (finding that the

appropriate measure of damages in a fraudulent stock conversion suit is the highest market value between the date of the conversion and the filing of the suit).

investment free of the risks other shareholders undertook. More importantly, however, trying to determine what part of the stock's appreciation Miga would have realized had he obtained the stock in December 1994 is to speculative. *Id.* at 216–17. Similarly, to award Investors the alleged "highest intermediate value" of the E shares as if they had been converted to A shares is too speculative. *See id.* Nicolleti's damage calculations based on stock prices in 2000 would provide the Investors with the windfall yielded from a riskless investment in a high-risk field. *See id.*

■ In sum, we conclude that the Nicoletti evidence does not raise a genuine issue of material fact as to the Investors' alleged damages. The Investors' claims for fraud, statutory fraud under Section 27.01 of the Texas Business and Commerce Act, securities fraud under the Texas Securities Act,[8] and negligent misrepresentation[9] all have the essential element of damages, and LightPath attacked this essential element in a no-evidence ground. After viewing the evidence under the applicable standard of review, we conclude that the trial court correctly determined that the summary-judgment evidence does not raise a genuine issue of material fact as to this essential element of damages.[10] There can be no recovery for damages that are speculative or conjectural. *A.B.F.*

*Freight Sys., Inc. v. Austrian Import Serv., Inc.*, 798 S.W.2d 606, 615 (Tex.App.-Dallas 1990, writ denied). Ignoring the legally insufficient damage testimony from Meyers and Nicoletti, there is no genuine issue of material fact as to whether the Investors sustained damages. *See Cohen v. Arthur Andersen, L.L.P.*, 106 S.W.3d 304, 305–07 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (holding that trial court correctly granted summary judgment based on no-evidence ground in fraud case). Accordingly, we overrule the Investors' issue in this regard, and we need not reach their other issues, except for the issue of the trial court's ability to exercise personal jurisdiction over D.H. Blair.

**D. Have the Investors' waived their issue as to the trial court's ability to exercise personal jurisdiction over D.H. Blair?**

■ In their final issue, the Investors assert that the trial court correctly denied the special appearance of defendant D.H. Blair. The Investors note that this court already has held to the contrary in the prior interlocutory appeal. *See D.H. Blair Inv. Banking Corp.*, 97 S.W.3d at 278–79. However, the Texas Supreme Court determined that it did not have jurisdiction over that interlocutory appeal, and the Investors want to preserve error in this court so that they can seek review of this jurisdic-

---

**8.** The Texas Securities Act provides a specific civil liability for those who fraudulently sell securities. *See* Tex.Rev.Civ. Stat. Ann. art. 581, § 33 (Vernon Supp.2004). Under this statute, a defrauded party "may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security." *Id.*, § 33(a)(2). The damages that a defrauded buyer may recover consist of the consideration paid for the security plus interest from the date of payment, less the greater of the value or the actual consideration received from the security when the buyer disposed of it. *Id.* § 33(d)(3).

**9.** Although the Investors also have asserted claims for statutory fraud and negligent misrepresentation, these fraud-based claims do not expand their potential recovery of damages or change the above analysis.

**10.** LightPath did not attack, and we do not address, any essential element of causation or reliance. Likewise, we do not base our opinion on any argument as to the admissibility of the expert testimony of Meyers or Nicoletti.

tional issue in the Texas Supreme Court following our decision in this case.

■ In response, D.H. Blair argues that the Investors have waived their appellate issue by failing to provide any argument or authorities. *See* Tex.R.App. 38.1(h). The Investors, however, already have briefed these very issues in their prior interlocutory appeal involving the same parties and jurisdictional arguments. Moreover, they assert that, for purposes of economy, they have incorporated by reference their trial court briefing on this issue. The appellate record in this case contains the jurisdictional briefing in the trial court, as well as this court's mandate and opinion from the prior interlocutory appeal, in which the Investors provided argument and authorities on these jurisdictional issues. We construe briefing rules reasonably yet liberally, so that the right to appeal is not lost by imposing requirements not absolutely necessary to effect the purpose of a rule. *See Republic Underwriters Ins. Co. v. Mex.–Tex Inc.,* 150 S.W.3d 423, 427 (Tex.2004); *Tex. Mexican Ry. Co. v. Bouchet,* 963 S.W.2d 52, 54–55 (Tex.1998). Under the unusual circumstances of this case and given that the Investors simply seek to preserve their ability to seek review in the Texas Supreme Court, we conclude that the *Young v. Neatherlin* case is not on point and that the Investors have not waived their issue regarding the trial court's ability to exercise personal jurisdiction over D.H. Blair. *See* 102 S.W.3d 415, 423 (Tex.App.-Houston [14th Dist.] 2003, no pet.) (indicating that parties cannot incorporate by reference briefing from another case into their appellate brief).

Nevertheless, because we conclude that this court's prior opinion as to this issue was not clearly erroneous, we overrule this issue under the law-of-the-case doctrine. *See Briscoe v. Goodmark Corp.,* 102 S.W.3d 714, 716–17 (Tex.2003).

## VI. Conclusion

The trial court correctly granted summary judgment as to the alleged misrepresentation by LightPath in the Proxy Letter that the E shares would have a post-IPO value of five dollars per share. Therefore, that alleged misrepresentation cannot provide a basis for the Investors' alleged damages. Under the applicable standard of review, the damage evidence upon which the Investors rely is speculative, conclusory, and does not raise a genuine issue of material fact as to the essential element of the Investors' alleged damages. Having concluded that the Investors did not establish a genuine issue of material fact as to damages, we overrule the Investors' issue in this regard. Under the law-of-the-case doctrine, we overrule the Investors' issue regarding the trial court's ability to exercise personal jurisdiction over D.H. Blair. Given these rulings, it is not necessary to reach the Investors' remaining issues. We affirm the trial court's judgment.